Filed 9/20/16  P. v. Shaver CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B262579 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA063280) |
| v. | |
| RUSSELL WAYNE SHAVER et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Charles Chung, Judge.  Affirmed as modified.

Christian C. Buckley, under appointment by the Court of Appeal, for Defendant and Appellant Russell Wayne Shaver.

Lenore O. De Vita, under appointment by the Court of Appeal, for Defendant and Appellant Joshua Jesse Davis.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Margaret E. Maxwell and Tannaz Kouhpainezhad, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In an information filed by the Los Angeles County District Attorney, defendants and appellants Russell Wayne Shaver (Shaver) and Joshua Jesse Davis (Davis) were charged with kidnapping to commit another crime, to wit, robbery (count 1; Pen. Code, § 209, subd. (b)(1)),[1] second degree robbery (count 2; § 211), attempted home invasion robbery (count 3; §§ 664/211), and attempted first degree burglary (count 4; §§ 664/459), with the special allegation that a person other than an accomplice was present (§ 667.5, subd. (c)(2)).[2] As to all counts, it was alleged that Davis personally used a deadly and dangerous weapon, to wit, a Taser (§ 12022, subd. (b)(1)). It was further alleged that Davis had suffered two prior convictions within the meaning of sections 1170.12, subdivision (b), and 667, subdivisions (b) through (j), and one prior serious felony conviction within the meaning of section 667, subdivision (a)(1).

Defendants pleaded not guilty and denied the special allegations.

Defendants were jointly tried before separate juries.

As to counts 1 through 3, Davis's jury found him guilty as charged and found the deadly weapon enhancements to be true. As to count 4, Davis's jury also found him guilty of attempted second degree burglary and found the deadly weapon enhancement to be true. And, Davis's jury found that a person was present during the commission of count 4. In a bifurcated proceeding, Davis waived his right to a trial on his priors and admitted the prior conviction allegations.

Davis was sentenced to 31 years to life under the "Three Strikes" law. Counts 2 through 4 were stayed pursuant to section 654.

Likewise, Shaver's jury found him guilty as charged as to counts 1 and 4. As to count 2, Shaver's jury found him guilty of the lesser included crime of grand theft (§ 487,

---

[1]    All further statutory references are to the Penal Code unless otherwise indicated.

[2]    The information also charged Asia Adams (Adams), Shaver's girlfriend, and Daythron Lockley (Lockley) with the same offenses. They were not tried with defendants.

subd. (c)), and as to count 3, it found him guilty of the lesser included crime of attempted grand theft (§§ 664/487, subd. (c)).

Shaver was sentenced as follows:  as to count 1, life in prison; as to count 2, one year in county jail; as to count 3, six months in county jail; as to count 4, two years in state prison.  Counts 2, 3, and 4 were ordered to run concurrently with count 1.

Defendants timely filed notices of appeal.  On appeal, Shaver argues:  (1) The kidnapping for robbery conviction must be reduced to simple kidnapping because there was insufficient evidence that (a) he knew that Davis intended to commit a robbery when he effected the kidnapping, and (b) he had the requisite personal intent to aid and abet a kidnap for robbery; (2) The jury was not properly instructed regarding aiding and abetting kidnapping for robbery; and (3) The section 677.5, subdivision (c)(21), "person present" allegation finding must be reversed.  Shaver also joins in all arguments raised by Davis to the extent that they accrue to his benefit.  Davis argues:  (1) The trial court erred in refusing the defense request to instruct the jury with CALCRIM instructions instead of CALJIC instructions; and (2) The trial court erred in ordering the sentences on counts 2, 3, and 4 to run concurrently with the sentence imposed on count 1 after staying the sentences on counts 2, 3, and 4.  Davis also joins in the issues raised by Shaver to the extent that they accrue to Davis's benefit.

We affirm but modify the judgment.

## FACTUAL BACKGROUND

I. *Prosecution Evidence*

A.  Evidence presented to both juries

On June 6, 2014, at around 3:30 p.m., Gaddiel Velasquez (Velasquez) was walking home with his headphones on when Davis approached him.  Shaver stood about two to three feet away and never got much further than that during Davis's interaction with Velasquez.  Davis asked Velasquez if he had a cell phone.  Because Velasquez did not feel safe being approached by a "random person out on the streets," Velasquez lied and told Davis that he did not.  Davis tapped on Velasquez's pant pocket and asked what was in it.  Feeling intimidated, Velasquez pulled his cell phone out of his pocket and

3

handed it to Davis. Davis texted someone, and defendants walked away with Velasquez's phone.

Because defendants had Velasquez's phone, Velasquez followed them. Davis turned around with a Taser in his hand and, while Shaver stood two feet to Davis's left, Davis activated the Taser for a second. Startled and scared, Velasquez jumped back. Davis told Velasquez, "'You are walking with us now,'" and handed Shaver the Taser, who put it in his pocket.

While the men were walking, Davis took Velasquez's satchel from his shoulder and looked through it. Velasquez's satchel contained an Xbox controller, two video games, and his phone charger. Davis handed Velasquez's satchel to Shaver, who kept it. Shaver talked on his phone for about five minutes during their walk, but was not really concentrating on his phone call.

After walking for 10 minutes, a car pulled up to the men. Adams was in the passenger seat with a male driver.[3] Davis told Velasquez to get in the car and "smacked" him in the back of the head. While Davis did this, Shaver got into the other side of the car with Velasquez's bag. Feeling threatened, Velasquez got into the back of the car with defendants sitting on either side of him. Davis told Velasquez to tell the driver where he lived. Velasquez gave the driver directions to his father's home. Davis asked Velasquez if anyone was home and what types of things and food he had at home.

Once they arrived at Velasquez's father's home, defendants and Velasquez exited the car. Davis told Velasquez to lie to his father and tell him that defendants were his friends. Velasquez unlocked the front door, walked in, quickly turned around, and tried to slam the door shut. Velasquez struggled to get the door shut while Davis tried to pry the door open with his arm. Velasquez slammed his shoulder into the door, shut the door, and then locked it. Velasquez, scared, ran around the house, screaming, trying to find his father.

---

**3**     The driver seems to have been Lockley.

Detective Mark Donnel was assigned as the investigating officer. During his investigation, Detective Donnel responded to a traffic stop of a tan Chevy Malibu. Detective Donnel determined that a cell phone recovered from the Chevy Malibu belonged to Velasquez. When Detective Donnel examined the phone, he noticed that it had been reset and a photograph of Shaver had been made into the "wallpaper" on the phone. The Chevy Malibu also contained numerous documents in Shaver's name. A few days later, the Taser was recovered from Shaver.

B. <u>Evidence presented to Davis's jury</u>

During his interview with detectives, Davis initially claimed that he was too high to remember what had happened. He said that his phone was dead or someone was using it, so he asked Velasquez, who was walking towards him, to use his phone. Velasquez told him that he did not have a phone, but Davis knew that Velasquez was lying. Velasquez finally lent his phone to Davis, talked to defendants like they were all friends, and walked down the street with them for five or 10 minutes. Davis told detectives that they were going to let Velasquez walk home, but when he told them that he was going to call the police, Davis told Velasquez, "'We fitting to take you to your house.'" Velasquez voluntarily walked defendants toward his house. Once their ride arrived, Velasquez willingly got into the car with defendants.

Davis also told detectives that he did not initially have the Taser, but that while Velasquez was behind defendants, Davis briefly pressed the Taser button, causing it to buzz. Davis also "jokingly" smacked Velasquez on the back of the head. Even though Davis did not mean to bully Velasquez, he was sure that Velasquez "felt bullied 'cause of the situation he was in." Davis got in the back of the car, behind the passenger seat, Shaver sat behind the driver, and Velasquez sat between them.

Eventually, Davis admitted that because Velasquez had games and a controller in his backpack and looked like he had money, defendants "fish[ed] around" and asked him what he had in his house. Davis admitted that if he had made it into the house, he would have taken "[a]nything worth value."

5

Once at Velasquez's home, defendants walked Velasquez to his door. When Velasquez opened the door, Davis put his foot right by the door at the threshold and, as Velasquez screamed and tried to close the door, Davis instinctively put his arm out with his hand on the door. Davis was not trying to fight with Velasquez; he just wanted to go inside Velasquez's house to see if there was "anything good" to take.

Ultimately, Davis admitted to detectives that he played a part in the "whole thing."

C. Evidence presented to Shaver's jury

During Shaver's interview with detectives, he initially denied all involvement. He claimed that he was on the phone with his father when Davis robbed Velasquez and then kidnapped him with the intention of robbing him at home. Eventually, Shaver admitted that the Taser belonged to him and that Davis took it out of Shaver's pocket before activating it. Shaver told detectives that he "was really just letting the work be done." Shaver explained that he was on the phone with his father and "wasn't really trying to say too much 'cause [Shaver] didn't want [his] dad or nobody to hear shit"; he got off the phone because they all got into the car and it was loud. While in the car, Shaver asked Velasquez what types of valuable items were in his house and told him to act as though defendants were his friends when they were in his home.

Shaver told the detectives that they all got into the car to take Velasquez to his house; the plan was to "run up in there" even though Shaver did not "want to do that shit." When asked what defendants wanted from Velasquez's house, Shaver admitted that they wanted whatever was worth money and that they intended to sell whatever they retrieved.

Shaver admitted that when they could not get into the house, both defendants ran back to the car and took off to "stash" the items previously taken from Velasquez.

Shaver also told the detectives that he told Velasquez to unlock his phone because Shaver wanted to give it to Adams.

II. *Defense Evidence*

Neither Davis nor Shaver testified or presented evidence.

**DISCUSSION**

*Shaver's Appeal*

I. *Sufficiency of the evidence of kidnapping for robbery*

Shaver argues that we should hold that he was only guilty of kidnapping for robbery as an aider and abettor if the prosecution proved that he had knowledge of Davis's unlawful purpose to commit robbery and had the specific intent to aid and abet Davis's commission of the robbery at the time Davis commenced the kidnapping. Although he concedes that he "eventually intended to aid and abet in a kidnapping, and eventually knew that Davis intended to burglarize Velasquez's home," he contends that the evidence was insufficient to prove that he knew that Davis intended to commit a robbery when Velasquez's kidnapping commenced or that he had personal independent intent to aid the kidnapping for robbery when it commenced.

A. Relevant law

Evidence is sufficient to support a conviction is, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 319; see also *People v. Hill* (1998) 17 Cal.4th 800, 848–849.)

Robbery is defined as "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) "Any person who kidnaps or carries away any individual to commit robbery" is guilty of kidnapping for robbery. (§ 209, subd. (b)(1).) Kidnapping to commit robbery includes the following elements: (1) a person was unlawfully compelled to move because of a reasonable apprehension of harm; (2) the movement of such person was caused with the specific intent to rob when the movement commenced; (3) the movement of the person was without the person's consent; (4) the movement of such person was for a distance more than slight, brief, or trivial; and (5) the movement substantially increased the risk of harm to the person moved, over and above that necessarily present in the crime of robbery. (See CALJIC No. 9.54; *People v. Gonzales* (1994) 21 Cal.App.4th 1648, 1652–1653.) A completed robbery is not an

7

element of kidnapping for robbery. (*People v. Lewis* (2008) 43 Cal.4th 415, 518–519, overruled in part on other grounds in *People v. Black* (2014) 58 Cal.4th 912, 919.) All that is required is that the defendant had the specific intent to commit robbery when the kidnapping began. (*People v. Davis* (2005) 36 Cal.4th 510, 565–566.)

A defendant who assists another to commit a crime is guilty as an aider and abettor. (*People v. Perez* (2005) 35 Cal.4th 1219, 1225.) But, the mental state necessary to convict a defendant as an aider and abettor is different from the mental state necessary to convict an actual perpetrator. (*People v. Mendoza* (1998) 18 Cal.4th 1114, 1122.) "The actual perpetrator must have whatever mental state is required for each crime charged. . . . An aider and abettor, on the other hand, must 'act with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense.' [Citation.]" (*People v. Mendoza*, *supra*, at p. 1123.)

B. Substantial evidence to support Shaver's conviction[4]

Here, substantial evidence supports Shaver's conviction for aggravated kidnapping. Velasquez testified that from the time Davis approached and initially robbed him of his phone, Shaver stood only two to three feet away and maintained the distance throughout Davis's interaction with Velasquez, including when Davis activated the Taser[5] and threatened "'You are walking with us now.'" Davis handed Shaver the Taser, where it remained visible as a threat to Velasquez. Because defendants walked together briefly before Davis used Shaver's Taser to threaten and kidnap Velasquez, the jury could

---

[4]    Davis purportedly joins in this argument. But, Davis was not prosecuted as an aider and abettor, and the thrust of Shaver's argument is that there is insufficient evidence to support his conviction for aiding and abetting. Therefore, this argument and analysis do not apply to him.

[5]    In addition, Shaver told detectives that the Taser belonged to him and when Davis took it out of his pocket to activate it, he "was really just letting the work be done." The jury could easily have understood this to mean that he knew what was going on, but he was letting Davis do the more active part of the job.

8

have inferred that during that time, defendants had discussed kidnapping Velasquez to rob him of more than just his phone and were devising a plan to secure transportation to Velasquez's house. Velasquez's testimony that Shaver was only a few feet away from Davis and maintained control over the Taser provided additional evidence that Shaver was actively assisting Davis.

Velasquez also testified that while the men walked, Shaver spoke to someone on the phone and constantly turned back to look at Velasquez. The jury could have inferred that Shaver was making arrangements with Adams to pick up the men and take them to Velasquez's home, and that defendants followed through with the kidnapping only once they knew that they had a ride to Velasquez's home.

Once defendants' transportation arrived, without any prompting, Shaver, who was holding Velasquez's satchel, got into the backseat of the car on the opposite side of Davis, sandwiching Velasquez between himself and Davis. The jury could have inferred that Shaver was trying to keep Velasquez from escaping before defendants had the opportunity to complete the kidnap for robbery.

After Velasquez was trapped in the car, Davis asked him if there was any money at his home; he then ordered Velasquez to tell the driver where he lived. Nothing indicates that either the driver or Shaver was even remotely surprised at Davis's demand, further suggesting that they were aware of the plan the entire time.[6]

Taken together, this evidence more than supports Shaver's conviction.

II. *Instructional error*

Shaver complains that two instructional errors occurred in his case. But, he did not raise these objections below. Therefore, his argument has been forfeited on appeal unless Shaver's substantial rights were affected. (§ 1259.) As set forth below, there was no instructional error; thus, Shaver's rights were not adversely impacted.

---

[6]      In response to the detective's question about the "plan," Shaver responded that it was "to run up in there," further indicating that he knew what the plan was.

Shaver asserts that "the jury should have been instructed that [he] needed to form the intent to aid and abet and kidnap for robbery before it commenced." But, through CALJIC Nos. 3.01 and 9.54, the jury was instructed on when Shaver's intent as an aider needed to be formed and that he intended to aid and abet the kidnapping.

Next Shaver argues that the instructions did not allow the jury to find him guilty of simple kidnapping even if Davis was convicted of kidnapping for robbery. Rather, according to Shaver, "the jury was informed that Davis and Shaver were 'equally guilty' of whatever crime Davis committed if [Shaver] aided and abetted the kidnapping." Setting aside Shaver's forfeiture of this argument (*People v. Lopez*, *supra*, 198 Cal.App.4th at pp. 1118–1119), the instructions as given permitted the jury to find Shaver guilty of the lesser included offense of simple kidnapping if it concluded that he did not possess all of the required elements of kidnap for robbery. The jury was not given CALJIC No. 3.00 in a vacuum. It was also instructed pursuant to CALJIC Nos. 3.01 (aiding and abetting), 9.50 (kidnapping), and 9.54 (kidnapping to commit robbery). Read together, the jury was instructed to evaluate Shaver's mental state to determine whether he aided and abetted the aggravated kidnapping or whether he was guilty of the lesser included offense of simple kidnapping. We presume that the jury was capable of understanding and correlating all jury instructions given. (*People v. Martin* (2000) Cal.App.4th 1107, 1111.) It follows that if the jury determined that the evidence did not establish all of the evidence of kidnapping for robbery, then it would have considered whether Shaver aided and abetted a simple kidnapping.

In his reply brief, Shaver asserts that the instructions were incorrect statements of the law, which affected his substantial rights; thus, his counsel's failure to object does not bar him from raising these arguments on appeal. He is mistaken—courts have recognized that CALJIC Nos. 3.00 and 3.01 are accurate statements of the law. (See *People v. Perez, supra,* 35 Cal.4th at p. 1234; *People v. Tillotson* (2007) 157 Cal.App.4th 517, 532; *People v. Mejia* (2012) 211 Cal.App.4th 586, 624.) And Shaver has not directed us to any case that has held that CALJIC No. 9.54 is an incorrect statement of the law. (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852.)

10

Even if the instructions were erroneous (which they were not), any error would have been harmless.  (*Chapman v. California* (1967) 386 U.S. 18, 24; *People v. Watson* (1956) 46 Cal.2d 818, 836.)  As set forth above, there was ample evidence that Shaver aided and abetted Davis in committing kidnapping for robbery.[7]

III.  *Section 677.5, subdivision (c)(21), finding*

Shaver argues that the section 677.5, subdivision (c)(21), "person present" allegation finding must be reversed.  Davis joins in this argument.  The People agree that the section 667.5 allegation does not apply to attempted burglary and should be stricken.

Because defendants were only convicted of attempted burglary, rather than first degree burglary, subdivision (c)(21) of section 677.5 does not apply.  (*People v. Ibarra* (1982) 134 Cal.App.3d 413, 425.)  Thus, the abstracts of judgment should be amended as follows:  For Shaver, the "violent felony" notation for count 4 should be deleted.  For Davis, who was convicted of attempted second degree burglary, both the "serious felony" and "violent felony" notations should be deleted.

**Davis's Appeal**

I.  *Instructional error*

Davis argues that the trial court erred in refusing a defense request to instruct the jury with CALCRIM instructions, opting to use CALJIC instructions instead.  Shaver joins in that argument.[8]

The adoption of CALCRIM instructions by the Judicial Council (Cal. Rules of Court, rule 2.1050(e)) does not establish that the prior "CALJIC instructions [were] invalid or 'outdated,'" as Davis claims here.  (*People v. Thomas* (2007) 150 Cal.App.4th

---

[7]    It follows that we reject Shaver's claim that he was denied effective assistance of counsel.  (*Strickland v. Washington* (1984) 466 U.S. 668, 687, 697.)

[8]    Notably, while Davis objected to the use of the CALJIC instructions, Shaver did not.  Shaver's challenge therefore has been forfeited on appeal.  (*People v. Franco* (2009) 180 Cal.App.4th 713, 719.)  Regardless, as set forth herein, the trial court did not err in using the CALJIC instructions.

461, 465.)[9] "'Nor did their wording become inadequate to inform the jury of the relevant legal principles or too confusing to be understood by jurors.'" (*People v. Lucas* (2014) 60 Cal.4th 153, 294, overruled on other grounds in *People v. Romero and Self* (2015) 62 Cal.4th 1, 53.) "The Judicial Council's adoption of the CALCRIM instructions simply meant they are now endorsed and viewed as superior. No statute, rule of court, or case mandates the use of CALCRIM instructions to the exclusion of other valid instructions." (*People v. Thomas*, *supra*, at pp. 465–466.) So long as the jury was properly instructed, which it was, the trial court did not err. (*Id*. at p. 465.)

In urging us to reverse, defendants argue that by not articulating a reason for opting to use the CALJIC instructions instead of the CALCRIM instructions, the trial court erred. But defendants direct us to no legal authority that requires the trial court to explain why it chose one set of instructions over another.

Finally, defendants claim that the "superiority of the CALCRIM [instructions] is obvious for several reasons." In support, defendants only indicate that CALJIC No. 2.00 is deficient. But, five years after the adoption of the CALCRIM, our Supreme Court has held that CALJIC No. 2.00 correctly states the law. (*People v. Livingston* (2012) 53 Cal.4th 1145, 1166.) And, regardless of whether the CALCRIM approach is superior, as already stated, the trial court did not err by giving the CALJIC instructions.

## II. *Sentencing of Davis*

Davis contends that the trial court erred in ordering the sentences on counts 2, 3, and 4 to run concurrently with the sentence on count 1, after ordering the sentences on those counts to be stayed. The People agree "that a sentence cannot be ordered to run concurrent *and* stayed pursuant to section 654."

We agree with the parties that the sentences on counts 2, 3, and 4 should have been stayed. (*People v. Duff* (2010) 50 Cal.4th 787, 796.) The abstract of judgment must be corrected to delete the concurrent sentence notations for counts 2, 3, and 4.

---

[9]    Defendants ask us to decline to follow *People v. Thomas*, *supra*, 150 Cal.App.4th 461 on the grounds that it is outdated; it was published in 2007, five months after the adoption of the CALCRIM. We see no basis to do so.

## DISPOSITION

The judgment is affirmed as modified.  As to both defendants, the section 667.5, subdivision (c)(21), sentencing enhancement is stricken from count 4.  As to Davis, the sentences on counts 2, 3, and 4 are stayed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
              ASHMANN-GERST

We concur:


_____, P. J.
     BOREN


_____, J.
     HOFFSTADT